UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


DAVID L. HAUSER and AMANDA      :
HAUSER as Co-Administrators of  :
the Estate of DAVID T. HAUSER,  :
            Plaintiffs,         :
                                :
        v.                      :       CA 10-423 S
                                :
STONEBRIDGE LIFE INSURANCE       :
COMPANY,                        :
            Defendant.          :


## REPORT AND RECOMMENDATION

David L. Martin, United States Magistrate Judge


This is an action for breach of contract, declaratory judgment, and bad faith. See Complaint (Docket ("Dkt.") #1) ¶¶ 18-26. Before the Court are cross motions for summary judgment: Defendant Stonebridge Life Insurance Company's Motion for Summary Judgment (Dkt. #12) (Defendant's Motion for Summary Judgment" or "Defendant's Motion") and Plaintiffs', David L. Hauser and Amanda Hauser as Co-Administrators of the Estate of David T. Hauser, Motion for Summary Judgment (Dkt. #21) ("Plaintiffs' Motion for Summary Judgment" or "Plaintiffs' Motion") (collectively the "Motions").

The Motions have been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons stated below, I recommend that Defendant's Motion be granted and that Plaintiffs' Motion be denied.

## I.    Facts and Travel

Defendant Stonebridge Life Insurance Company ("Defendant" or "Stonebridge") is incorporated in the State of Vermont.  Complaint ¶ 3.  Plaintiffs David L. Hauser and Amanda Hauser ("Plaintiffs") are the son and daughter of the decedent, David T. Hauser ("Mr. Hauser").  Defendant Stonebridge Life Insurance Company's Statement of Undisputed Facts in Support of Its Motion for Summary Judgment (Dkt. #15) ("Defendant's SUF")[1] ¶ 27.  Plaintiffs are the co-administrators of the estate of Mr. Hauser, having been so appointed by the Probate Court of the Town of West Warwick, Rhode Island, where they reside, on June 3, 2009.  Complaint ¶¶ 1-2.[2]

Stonebridge issued a group accidental death and dismemberment ("AD&D") insurance policy No. 25517 GC992 (the "Policy") to Bank of America, N.A.  Defendant's SUF ¶ 1.  Stonebridge issued Certificate of Insurance No. 82A92V3269 (the "Certificate") under that Policy to Mr. Hauser on February 25, 2008.  Id. (citing Affidavit of Laura

---

[1] Neither Plaintiffs nor Defendant submitted a statement of disputed facts.  See Dkt.  Plaintiffs state that they "adopt the Statement of Undisputed facts presented by the defendant in support of its motion for summary judgment, as well as their own additional Statement of Undisputed Facts provided in support of their objection."  Memorandum of Law in Support of Plaintiffs', David L. Hauser and Amanda Hauser as Co-Administrators of the Estate of David T. Hauser, Motion for Summary Judgment ("Plaintiffs' S.J. Mem.") at 1; see also Plaintiffs', David L. Hauser and Amanda Hauser, as Co-Administrators of the Estate of David T. Hauser, Statement of Undisputed Facts in Support of Its Objection to Defendant Stonebridge Life Insurance Company's Motion for Summary Judgment (Dkt. #20) ("Plaintiffs' SUF").

[2] Defendant states that it "[l]acks knowledge or information sufficient to form a belief as to the truth of paragraphs 1[] and 2."  Answer (Dkt. #5) ¶ 1.

Allen (Dkt. #13) ("Allen Aff.") ¶ 5; id., Exhibit ("Ex.") 1 (Certificate)); see also Complaint ¶¶ 6-7. The Certificate provides in Part II that:

If a Covered Person[3] is Injured:[4]

1. by being struck by a Private Passenger Automobile; or
2. as a direct result of a collision or crash of a Private Passenger Automobile; or
3. by being struck by a Land Motor Vehicle; or
4. as a direct result of a collision or crash of a Land Motor Vehicle,

we will pay the applicable benefit specified in Part II of the Schedule of Insurance for the appropriate Loss[5] as shown in the Schedule of Losses and Benefits.

Defendant's SUF ¶ 2 (quoting Allen Aff., Ex. 1 at 4). The

---

[3] A "covered person" is, for coverage purposes only, the insured and:

1. your spouse; and
2. each of your children including step-children, children born to you or legally adopted by you, ... and
3. your unmarried child 19 years of age but less than 23 years of age if the child is:
   a. a full-time student; and
   b. dependent upon you for support and maintenance.

Affidavit of Laura Allen (Dkt. #13) ("Allen Aff."), Exhibit ("Ex.") 1 at 3.

[4] "Injured" is defined as "having suffered an Injury." Defendant's SUF ¶ 3 (quoting Allen Aff., Ex. 1 at 3).

[5] The Certificate provides in relevant part that:

Loss means:

1. Loss of life.

....

Plaintiffs' SUF ¶ 29 (quoting Allen Aff., Ex. 1 at 3).

Certificate further provides that an injury, "for which benefits are provided, means bodily injury caused by an accident which occurs while this Certificate is in force. The injury must be the direct cause of Loss, independent of disease or bodily infirmity." Allen Aff., Ex. 1 at 3; <u>see also</u> Defendant's SUF ¶ 3. However, the Certificate also states that:

> No benefit shall be paid for Injury that:
>
> 4.   is caused by or results from the Covered Person's blood alcohol level being .08 percent weight by volume or higher.
>
> ***
>
> 6. has as its contributing cause, the Covered Person's commission of or attempt to commit a felony ...

Defendant's SUF ¶ 4 (quoting Allen Aff., Ex. 1 at 4)(alterations in original).

On Sunday, March 1, 2009, Mr. Hauser was killed while traveling on Route 295 in the Town of Smithfield, Rhode Island. Complaint ¶ 8. At approximately 9:00 p.m., Mr. Hauser drove his 2002 Lincoln Continental with a blood alcohol level of 0.32%. Defendant's SUF ¶ 5 (citing Allen Aff. ¶¶ 7-9; <u>id.</u>, Exs. 2-4). He drove northbound on I-295 and smashed the front end of his Continental into the guardrail "with such force that '[t]he front end had been smashed almost into the, up to the fire wall.'" Defendant's SUF ¶ 6 (quoting <u>id.</u>, Ex. A (Deposition of David M. Demuth ("Demuth Dep.")) at 6)(alteration in original). The force of the impact ejected Mr. Hauser from his vehicle, and his body

landed in the middle of the highway.  Id. ¶ 8.

    The next vehicle to come along was a black Lincoln
Continental[6] driven by David M. Demuth ("Mr. Demuth").  Id. ¶ 9.
Mr. Demuth subsequently testified that he thought Mr. Hauser's
vehicle was a dumpster that had fallen off a truck because it was
unrecognizable as a vehicle.  Id. ¶ 10.  Mr. Demuth's car struck
what remained of Mr. Hauser's Continental and then reportedly ran
over Mr. Hauser's body.  Id. ¶ 11.  Shortly after Mr. Demuth's
vehicle came to rest, first responders began arriving at the scene.
Id. ¶¶ 12, 22 (citing Demuth Dep. at 6).

    State Trooper Kristopher Lagor reported that "Operator #1 [Mr.
Hauser] lost control of vehicle #1 due to icy road conditions."
Id. ¶ 13 (quoting Allen Aff., Ex. 2 (Lagor Incident Report) at 5)
(alteration in original); see also id. ¶ 20.  In his report, State
Trooper Nicholas Revello[7] wrote that "the weather conditions were
freezing rain/snow and the roadways were coated with ice and a
small amount of snow."  Id. ¶ 14 (quoting id., Ex. C (Revello
Incident Report) at 3); see also id. ¶ 21.  Further, the report of

_____

    [6] Although Defendant's SUF states that Mr. Demuth was driving a
Lincoln Continental, in his statement to the Rhode Island State Police
Mr. Demuth described his vehicle as a "1997 Lincoln Town C[a]r ...."
Defendant's SUF, Ex. C (Witness Statement) at 1.  The Court notes that
Ex. C to Defendant's SUF contains a number of reports.

    [7] Both Defendant and Plaintiffs refer to "State Trooper Nicholas
Revello[.]"  Defendant's SUF ¶ 14; Plaintiffs' SUF ¶ 30.  However, in Ex.
C to Defendant's SUF, the trooper's last name is spelled "Rivello[.]"
Defendant's SUF, Ex. C.  For convenience, the Court adopts the parties'
spelling.

the Rhode Island State Police Collision Reconstruction Unit states that "[t]he cream Lincoln was travelling north in the third lane of travel in heavy snow conditions. As a result of poor road conditions, the cream Lincoln lost control and exited the roadway to the west causing the front of the vehicle to strike the guardrail parallel to the roadway." Id. ¶ 15 (quoting id., Ex. D (Collision Reconstruction Unit Report)(alteration in original). Mr. Demuth, however, stated that the weather and road conditions were "[s]light precipitation ... I had my windshield wipers on moderate." Id. ¶ 18 (quoting id., Ex. C (Witness Statement) at 1) (second alteration in original). During his deposition, Mr. Demuth testified that:

> A.    ... it was raining at the time this happened, and probably within the next 20 minutes it turned over to snow and ice.
>
> Q.    20 minutes after the collision?
>
> A.    Correct.

Id. ¶ 19 (quoting id., Ex. A (Demuth Dep.) at 11)(alteration in original).

The Assistant Medical Examiner's autopsy report was completed on March 3, 2009. Id. ¶ 23. Alexander Chirkov, M.D., the Assistant Medical Examiner, concluded that Mr. Hauser's death "was the 'result of multiple traumatic injuries due to blunt force impact. [Mr. Hauser] was the unrestrained driver of a car who was ejected and was subsequently run over by another vehicle.'" Id.

(quoting Allen Aff., Ex. 5 (Autopsy Report) at 5)(alteration in original).  According to the Collision Reconstruction Unit's investigation:

> It was undeterminable by members of the Rhode Island
> State Police Collision Reconstruction Unit and the
> Department of Health Medical Examiner's Office if the
> fatal injuries sustained by the operator of the cream
> color Lincoln were the result of the initial impact with
> the guardrail or as a result of contact with the black
> Lincoln.

Id., Ex. D (Collision Reconstruction Unit Report).  The toxicology report dated March 19, 2009, revealed that Mr. Hauser's blood alcohol level was 0.32%.  Id. ¶ 24.

 The Policy provided an accidental death benefit in the amount of $100,000.  Complaint ¶ 14.  The Policy was in effect on March 1, 2009.  Id. ¶ 9.  Plaintiffs timely filed a claim under the Policy seeking accidental death benefits.  Id. ¶ 14; Defendant's SUF ¶ 27. Stonebridge denied the claim on the basis that Mr. Hauser's death was not an accident and that the alcohol and felony exclusions applied.  Defendant's SUF ¶ 28 (citing Allen Aff., Ex. 6 (Letter from Stonebridge to Hultquist of 3/1/10)).

Thereafter, on October 12, 2010, Plaintiffs filed a Complaint in this Court.  See Dkt.; see also Complaint.  The Complaint contains three counts, for breach of contract, Complaint ¶¶ 19-20, declaratory judgment, id. ¶¶ 22-23, and bad faith, id. ¶¶ 25-26. Plaintiffs seek a declaration that Paragraph 4 of the Exclusion Section of the Policy is ambiguous and should be construed against

Defendant in favor of coverage, <u>id.</u> at 5, and judgment against Defendant in the amount of $100,000 plus interest, costs, attorneys' fees, and punitive damages for the allegedly bad faith denial of Plaintiffs' claim, <u>id.</u>

Stonebridge filed Defendant's Motion for Summary Judgment on June 6, 2011, <u>see</u> Dkt., to which Plaintiffs on June 30, 2011, filed an objection, <u>see</u> Plaintiffs', David L. Hauser and Amanda Hauser, as Co-Administrators of the Estate of David T. Hauser, Objection to Defendant Stonebridge Life Insurance Company's Motion for Summary Judgment (Dkt. #18) ("Plaintiffs' Objection"). On July 1, 2011, Plaintiffs filed their Motion for Summary Judgment, <u>see</u> Dkt. Defendant filed its objection thereto on July 18, 2011. <u>See</u> Defendant Stonebridge Life Insurance Company's Objection to Plaintiffs' Cross Motion for Summary Judgment (Dkt. #22) ("Defendant's Objection"). A hearing was held on August 24, 2011, <u>see</u> Dkt., after which the matter was taken under advisement.

## II. Summary Judgment Standard

"Summary judgment is appropriate if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" <u>Commercial Union Ins. Co. v. Pesante</u>, 459 F.3d 34, 37 (1st Cir. 2006)(quoting Fed. R. Civ. P. 56)); <u>accord</u> <u>Kearney v. Town of Wareham</u>, 316 F.3d 18, 21 (1st Cir.

2002).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.  A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law."  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000)(quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).

In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party."  Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000)(citing Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996)).  "[T]he standards are the same where, as here, both parties have moved for summary judgment."  Pacific Ins. Co. v. Eaton Vance Mgmt., 369 F.3d 584, 588 (1st Cir. 2004)(quoting Bienkowski v. Northeastern Univ., 285 F.3d 138, 140 (1st Cir. 2002)(citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720, at 335-36 (3d ed. 1998)("The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.")));  see also Specialty Nat'l Ins. Co. v. OneBeacon Ins. Co., 486 F.3d 727, 732 (1st Cir. 2007)("The presence of cross-motions for summary judgment neither dilutes nor distorts this

standard of review.")(quoting <u>Mandel v. Boston Phoenix, Inc.</u>, 456 F.3d 198, 205 (1st Cir. 2006)). However, where, as here, the facts are not disputed, "[c]ross motions simply require [the Court] to determine whether either of the parties deserves judgment as a matter of law ....").  <u>Curran v. Cousins</u>, 509 F.3d 36, 44 (1st Cir. 2007)(first alteration in original); <u>see also</u> <u>Stamp v. Metro. Life Ins. Co.</u>, 466 F.Supp.2d 422, 427 (D.R.I. 2006) ("<u>Stamp I</u>"), <u>aff'd</u>, 531 F.3d 84 (1st Cir. 2008) ("<u>Stamp II</u>").

The non-moving party may not rest merely upon the allegations or denials in its pleading, but must set forth specific facts showing that a genuine issue of material fact exists as to each issue upon which it would bear the ultimate burden of proof at trial.  <u>See</u> <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d at 53 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256, 106 S.Ct. 2505 (1986)).  "[T]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party."  <u>ATC Realty, LLC v. Town of Kingston</u>, 303 F.3d 91, 94 (1st Cir. 2002)(quoting <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d 836, 842 (1st Cir. 1993)) (alteration in original)(internal quotation marks omitted).

"[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage."  <u>Coyne v. Taber</u>

<u>Partners I</u>, 53 F.3d 454, 460 (1st Cir. 1995). Furthermore, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial. If the evidence presented is subject to conflicting interpretations, or reasonable men might differ as to its significance, summary judgment is improper." <u>Gannon v. Narragansett Elec. Co.</u>, 777 F. Supp. 167, 169 (D.R.I. 1991)(citation and internal quotation marks omitted).

## III. Discussion

### A. Interpretation of Insurance Contracts

In interpreting insurance contracts, the Rhode Island Supreme Court has stated that:

> This Court applies the rules for construction of contracts when interpreting an insurance policy and will depart from the literal language of the policy only if the policy is ambiguous. To determine whether the policy is ambiguous, we give words their plain, ordinary, and usual meaning. The Court considers the policy in its entirety and does not establish ambiguity by viewing a word in isolation or by taking a phrase out of context. The Court will refrain from engaging in mental gymnastics or from stretching the imagination to read ambiguity into a policy where none is present. In determining whether the contract has an ambiguous meaning, this Court cannot consider the subjective intent of the parties; but rather must consider the intent expressed by the language of the contract. A contract, however, is ambiguous when it is reasonably susceptible of different constructions.

<u>Bliss Mine Rd. Condo. Ass'n v. Nationwide Prop. & Cas. Ins. Co.</u>, 11 A.3d 1078, 1083-84 (R.I. 2010)(internal citations and quotation marks eliminated); <u>see also</u> <u>Pawtucket Mut. Ins. Co. v. Gay</u>, 786 A.2d 383, 386 (R.I. 2001). Whether a contract is ambiguous is a

question of law.  Bliss Mine Rd. Condo. Ass'n, 11 A.3d at 1083.

If, after the policy is read in its entirety, the terms are found to be ambiguous or capable of more than one reasonable meaning, the policy will be strictly construed in favor of the insured and against the insurer.  Aetna Cas. & Sur. Co. v. Sullivan, 633 A.2d 684, 686 (R.I. 1993); see also Open Software Found., Inc. v. U.S. Fid. & Guar. Co., 307 F.3d 11, 17 (1st Cir. 2002)(noting that "courts are generally obliged to construe ambiguous terms in an insurance contract in favor of the insured").  However, "if the policy is determined to be clear and unambiguous, judicial construction is eclipsed and the contract must be applied as written."  Aetna Cas. & Sur. Co., 633 A.2d at 686.

Generally speaking, the insured seeking to establish coverage bears the burden of proving a prima facie case that coverage exists, including, but not limited to, "the existence and validity of a policy, the loss as within the policy coverage, and the insurer's refusal to make payments as required by the terms of the policy."  Gen. Accident Ins. Co. of Am. v. Am. Nat'l Fireproofing, Inc., 716 A.2d 751, 757 (R.I. 1998).  The burden then shifts to the insurer to prove the applicability of policy exclusions and limitations in order to avoid an adverse judgment, id., "but only after the insured has sustained its burden and established its prima facie case," id.

**B.  Issues**

Defendant argues that it is entitled to summary judgment on all counts of Plaintiffs' Complaint.  <u>See</u> Memorandum of Law in Support of Defendant Stonebridge Life Insurance Company's Motion for Summary Judgment (Dkt. #16) ("Defendant's S.J. Mem.") at 19. According to Defendant:

> Policy benefits are not payable as a matter of law because: (1) Mr. Hauser's death was not accidental; (2) the alcohol exclusion precludes coverage where Mr. Hauser's death resulted from a blood alcohol level ... of 0.32%; and (3) the felony exclusion precludes coverage where Mr. Hauser's death had as a contributing factor a violation of R.I. Gen. Laws §§ 31-27-1, 1.1, and/or 1.2 (driving so as to endanger, resulting in death, personal injury[,] and/or physical injury; collectively "the reckless driving statutes").

<u>Id.</u> at 1; <u>see also</u> <u>id.</u> at 5.  Defendant also contends that "Plaintiffs' bad faith claim fails because Mr. Hauser's death is not a covered event and Stonebridge's denial of AD&D benefits is fully supported by the facts and law of the claim."  Defendant's S.J. Mem. at 18.

Plaintiffs move for summary judgment on Counts I and II of their Complaint.[8]  Memorandum of Law in Support of Plaintiffs', David L. Hauser and Amanda Hauser as Co-Administrators of the Estate of David T. Hauser, Motion for Summary Judgment

---

[8] Plaintiffs do not seek summary judgment on Count III of their Complaint.  Memorandum of Law in Support of Plaintiffs', David L. Hauser and Amanda Hauser as Co-Administrators of the Estate of David T. Hauser, Objection to Defendant Stonebridge Life Insurance Company's Motion for Summary Judgment (Dkt. #19) ("Plaintiffs' Obj. Mem.") at 2.

("Plaintiffs' S.J. Mem.") at 1.  They argue that "[a] plain reading of the contract indicates that benefits are to be paid when death results from an automobile accident.  The only true challenge to coverage would come from an applicable exclusion.  Since neither exclusion applies to the case at bar, Plaintiffs' Motion for Summary Judgment should be granted."  Id. at 7.

### C.  Analysis

It is undisputed that Plaintiffs have met their burden of establishing the first and third prongs of their prima facie case, namely that a valid policy was in existence at the time of the event, see Complaint ¶¶ 6-7; Defendants' SUF ¶¶ 1-2; see also Complaint ¶ 9, and that Defendant refused to pay benefits, see Defendant's SUF ¶ 28.  Thus, the inquiry turns on the second prong, whether the loss was within the policy coverage, see Gen. Accident Ins. Co. of Am., 716 A.2d at 757; see also Stamp II, 531 F.3d at 93 (noting that "we are concerned with the definition of 'accident' as a threshold of eligibility for benefits"); Mullaney v. Aetna U.S. Healthcare, 103 F.Supp.2d 486, 490 (D.R.I. 2000)("The crux of this case turns on the meaning of 'accident.'").

### 1.  Was the event an accident?

Plaintiffs argue that Defendant wrongfully contends the death of Mr. Hauser was not accidental.  Plaintiffs' S.J. Mem. at 6. Defendant posits that "Mr. Hauser's death was no accident because it was caused by volitional acts he knew or should have known were

highly likely to result in death or serious bodily injury."
Defendant's S.J. Mem. at 7.

Plaintiffs make several arguments in support of their
contention that Mr. Hauser's death was an accident. First, they
state that "[t]here is no evidence in the record regarding the
'volition' of the decedent prior to the accident. The affidavits
do not speak of any 'volitional' acts, or acts that were 'highly
likely' to result in death or serious bodily injury." Plaintiffs'
S.J Mem. at 6 (bold omitted).[9] However, the fact that Mr. Hauser
chose to drive with a blood alcohol level four times the legal
limit[10] is, in itself, evidence of volition and surely constitutes
an act that was highly likely to result in death or serious bodily
injury. See Schultz v. Metro. Life Ins. Co., 994 F.Supp. 1419,
1421 (M.D. Fla. 1997)("It is just common sense that a driver whose

_____

[9] Plaintiffs further note that "[t]here is no evidence in the record
of how or when the decedent ingested alcohol, or the circumstances under
which alcohol came to be in the decedent's system." Plaintiffs' S.J.
Mem. at 6. The Court finds it irrelevant "how or when the decedent
ingested alcohol," id., as there is no dispute that the toxicology report
found Mr. Hauser to have a blood alcohol level of .32%, see Defendant's
SUF ¶ 24 (citing Allen Aff., Ex. 4 (Toxicology Report)).

[10] Section 31-27-2 of the Rhode Island General Laws provides that:

Any person charged under subsection (a) of this section whose
blood alcohol concentration is eight one-hundredths of one per
cent (.08%) or more by weight as shown by a chemical analysis
of a blood, breath, or urine sample shall be guilty of
violating subsection (a) of this section.

R.I. Gen. Laws § 31-27-2(b)(1) (2010 Reenactment); see also Stamp v.
Metro. Life Ins. Co., 531 F.3d 84, 86 n.1 (1st Cir. 2008) ("Stamp II")
(noting that "Rhode Island criminalizes driving with a [blood alcohol
content] of .08% or higher.").

15

faculties are significantly impaired by alcohol or drugs, or both, risks his life as well as others."); see also Sorrells v. Sun Life Assurance Co. Of Canada, 85 F.Supp.2d 1221, 1235 (S.D. Ala. 2000) (noting, in context of exclusion for voluntary participation in felony, that "[Decedent] voluntarily drank too much. He voluntarily got behind the wheel of his automobile while drunk.") (quoting Baker v. Provident Life & Accident Ins. Co., 171 F.3d 939, 942-43 (4th Cir. 1999)).

Second, Plaintiffs argue that "the cases that Defendant cites regarding lack of coverage for accidental death benefits are inapplicable, as they are either ERISA[11] cases or cases in which the fact patterns are much different than the case at bar." Plaintiffs' S.J. Mem. at 6. Defendant argued at the hearing that the fact that many of the cases cited in Defendant's S.J. Mem. are ERISA cases does not distinguish them from the issues before this Court. Specifically, Defendant stated that, even where the standard of review was deferential, the courts ultimately began by addressing whether the determination that the death was not accidental was reasonable.[12] See, e.g., Kovach v. Zurich Am. Ins.

_____

[11] Employment Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, et seq. ("ERISA").

[12] In the two District of Rhode Island cases discussed infra, Mullaney v. Aetna U.S. Healthcare, 103 F.Supp.2d 486 (D.R.I. 2000), and Stamp I, see Discussion section III. C. 1. infra at 20-24, the standard of review was de novo in Mullaney, see 103 F.Supp.2d at 490, and the more deferential arbitrary and capricious standard in Stamp I, see 466 F.Supp.2d at 428.

<u>Co.</u>, 587 F.3d 323, 332 (6th Cir. 2009)("The central focus of our review is whether Zurich's interpretation of the term 'accidental,' as used in the Plan, was reasonable."). The Court finds that although the cited cases are ERISA cases they are, nonetheless, instructive.[13]

Third, Plaintiffs contend that:

> By its general terms, the [Policy] provides benefits in the case of a death that results from a collision or crash of a Private Passenger Automobile; or as a direct result of a collision or crash of a Private Passenger Automobile. A plain reading of the contract indicates that benefits are to be paid when death results from an automobile accident.

Plaintiffs' S.J. Mem. at 7 (internal quotation marks omitted); <u>see also</u> Allen Aff., Ex. 1 at 4. Thus, Plaintiffs appear to contend that the term "accident" is not ambiguous.[14] Plaintiffs' S.J. Mem.

_____

[13] In its Answer (Dkt. #5), Defendant states as its Second Defense that:

> Plaintiffs' claims against Stonebridge may arise under [ERISA]. To the extent the Complaint makes claims and seeks remedies not provided for under ERISA, those claims and those remedies are pre-empted by ERISA. <u>Pilot Life v. Dedeaux</u>, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

Answer ¶ 13. Plaintiffs contended at the August 24th hearing that this case is purely an insurance case and that the Court should look to the language of the Policy, whereas in ERISA cases the issue is whether the plan administrator's determination was arbitrary and capricious.
The Court need not resolve the issue of whether this case is an ERISA case or not because the outcome would be the same. The Court is bound to follow the First Circuit's decisions in <u>Wickman v. Northwestern National Insurance Co.</u>, 908 F.2d 1077 (1st Cir. 1990), and <u>Stamp II</u> and this Court's decisions in <u>Mullaney</u> and <u>Stamp I</u>, all ERISA cases.

[14] In Plaintiffs' S.J. Mem., Plaintiffs declined to "engag[e] Defendant in dueling definitions of 'Accident' ...." Plaintiffs' S.J. Mem. at 6.

at 7.  However, the Policy does not define "accident."   Allen
Aff., Ex. 1 at 4.  Thus, the Court is constrained to find that the
term "accident," as used in the Policy, is ambiguous.  See Stamp I,
466 F.Supp.2d at 429 ("As other courts have found in interpreting
policies similar to those at issue here, the term 'accident' is
nothing but ambiguous."); Mullaney, 103 F.Supp.2d at 491 ("It is
clear, however, that the word 'accident,' when used in the context
of an insurance policy, does not have a plain and ordinary
meaning."); cf. Bliss Mine Rd. Condo. Ass'n, 11 A.3d at 1085 ("[I]t
is our opinion that the term 'windstorm,' as used in the policy, is
reasonably susceptible to more than one meaning, and that it
therefore is ambiguous.").

Plaintiffs rely on Smith v. Stonebridge Life Insurance Co.,
473 F.Supp.2d 903 (W.D. Wis. 2007), and urge this Court to adopt
its reasoning, see Plaintiffs' S.J. Mem. at 2-6.  However, while
the fact pattern in Smith is similar to that in the instant matter,
473 F.Supp.2d at 906-07, the Smith court focused on the policy
exclusions at issue and did not discuss whether driving while
intoxicated constituted an accident, id. at 908-09.  Rather, in the
context of addressing the parties' burdens, the court simply stated
that "[p]laintiffs have shown that [the decedent's] death occurred
as a result of an automobile accident, normally covered under the
policy."  Id. at 908.  Thus, Smith provides no guidance on this
issue.

The Court of Appeals for the First Circuit has provided such guidance, albeit in an ERISA case, <u>Wickman v. Northwestern National Life Insurance Co.</u>, 908 F.2d 1077 (1st Cir. 1990), for determining what constitutes an "accident" within the meaning of an insurance policy, <u>see</u> <u>id.</u> at 1085. According to the First Circuit, "[t]he question comes down to what level of expectation is necessary for an act to constitute an accident; whether an intentional act proximately resulting in injury or only the ultimate injury itself must be accidental." <u>Id.</u>; <u>see also</u> <u>Buce v. Allianz Life Ins. Co.</u>, 247 F.3d 1133, 1145 (11th Cir. 2001)(quoting <u>Wickman</u>); <u>Baker</u>, 171 F.3d at 942.

The <u>Wickman</u> court first surveyed state judicial interpretations of "accidental." 908 F.2d at 1085; <u>see also</u> <u>id.</u> at 1085-87. After noting that "[g]enerally, insureds purchase accident insurance for the very purpose of obtaining protection from their own miscalculations and misjudgments," <u>id.</u> at 1088, the court stated that "the reasonable expectations of the insured when the policy was purchased is the proper starting point for a determination of whether an injury was accidental under its terms," <u>id.</u> The <u>Wickman</u> court continued:

> If the fact-finder determines that the insured did not expect an injury similar in type or kind to that suffered, the fact-finder must then examine whether the suppositions which underlay that expectation were reasonable. This analysis will prevent unrealistic expectations from undermining the purpose of accident insurance. If the fact-finder determines that the suppositions were unreasonable, then the injuries shall

be deemed not accidental. The determination of what
suppositions are unreasonable should be made from the
perspective of the insured, allowing the insured a great
deal of latitude and taking into account the insured's
personal characteristics and experiences.
  Finally, if the fact-finder, in attempting to ascertain
the insured's actual expectation, finds the evidence
insufficient to accurately determine the insured's
subjective expectation, the fact-finder should then
engage in an objective analysis of the insured's
expectations. In this analysis, one must ask whether a
reasonable person, with background and characteristics
similar to the insured, would have viewed the injury as
highly likely to occur as a result of the insured's
intentional conduct. An objective analysis, when the
background and characteristics of the insured are taken
into account, serves as a good proxy for actual
expectation. Requiring an analysis from the perspective
of the reasonable person in the shoes of the insured
fulfills the axiom that [the] accident should be judged
from the perspective of the insured.

Wickman, 908 F.2d at 1088 (internal citations omitted).

Although Wickman did not involve a situation where the

decedent was driving while intoxicated, other courts, including

this one, have applied the Wickman test in that context. See

Mullaney, 103 F.Supp.2d at 493 ("Although the facts of Wickman do

not involve driving while intoxicated, the test which Wickman

establishes can be applied to cases of drunk driving. Several

courts, recognizing the applicability of the Wickman test in such

cases, have utilized it in their analysis and have found that death

resulting from such activity not to be accidental."); see also

Poeppel v. Hartford Life Ins. Co., 273 F.Supp.2d 714, 719 (D.S.C.

2003)(same); id. (citing cases); Mullaney, 103 F.Supp.2d at 493-94

(citing cases); Defendant's S.J. Mem. at 10 (listing cases). The

First Circuit noted in <u>Stamp II</u> that "[a]pplying <u>Wickman</u>, federal courts have, with near universal accord, upheld plan administrators' determinations that alcohol-related injuries and deaths are not 'accidental' under insurance contracts governed by ERISA." 531 F.3d at 89 (some internal quotation marks omitted); <u>see also</u> <u>Cozzie v. Metro. Life Ins. Co.</u>, 140 F.3d 1104, 1110 (7th Cir. 1998)(noting that other courts, employing the <u>Wickman</u> approach to defining "accident," have reached the conclusion that a death which occurs as a result of driving while intoxicated is not an "accident" because that result is reasonably foreseeable").

In <u>Mullaney</u>, this Court was faced with the question of "whether death resulting from driving while intoxicated constitutes an accident under the federal common law that governs ERISA." 103 F.Supp.2d at 488. The Court concluded that it did not. <u>Id.</u> The Court noted that the "crux" of the case turned on the meaning of "accident," 103 F.Supp.2d at 490, specifically "whether or not the insured's death was an 'accident' within the meaning of the policy issued by defendant," <u>id.</u> at 491.

The <u>Mullaney</u> Court observed that "[t]he older cases typically defined 'accident' as something unintended and unforeseen."[15] 103 F.Supp.2d at 491. The Court rejected the reasoning of these cases,

---

[15] <u>See, e.g.</u>, <u>Gen. Accident Ins. Co. of Am. v. Olivier</u>, 574 A.2d 1240, 1242 (R.I. 1990)(concluding that decedent's death, from her perspective, "was certainly an unusual, unexpected and unforeseen occurrence" and was, therefore, caused by an accident).

stating that:

> All of those cases turn on the question of intent or
> foreseeability.  If the injury or death as the result of
> an action is neither foreseen nor intended, then the
> resulting injury or death is deemed an accident.  Such a
> standard critically changes the meaning of the word
> "accident."  Following such reasoning, any action short
> of suicide would have to be deemed an accident.  In
> addition, in considering whether or not the fateful
> consequences of an accident were foreseen, many courts
> applied a subjective test–if the actor did not foresee
> the results of his actions, his fate was ruled an
> accident.  Little attention was given to objective
> standards and the question of whether or not a
> "reasonable person" in the actor's position would have
> foreseen the ultimate outcome of the action.

Mullaney, 103 F.Supp.2d at 492.

Utilizing the Wickman test, the Mullaney Court stated that:

>   Applying the rule of Wickman this Court holds that Mr.
> Mullaney's death cannot be deemed an accident.  Mr.
> Mullaney was driving at night at an excessive rate of
> speed, conditions that alone would have rendered his
> actions unsafe.  In addition, Mr. Mullaney, on the
> evening in question, had consumed enough alcohol to give
> him a blood alcohol level of nearly four times the legal
> limit.  At this level of intoxication, Mr. Mullaney had
> little control over his physical or mental faculties, and
> so little control of his vehicle that he did not even
> attempt to apply the brakes.
>   Even if it be assumed that Mr. Mullaney himself may not
> have intended or foreseen any harm in attempting to drive
> while grossly intoxicated, a reasonable person surely
> would have known that such conduct would likely result in
> serious bodily harm or death.  Mr. Mullaney's actions
> clearly fail the Wickman test, and his death cannot be
> considered "accidental." ...

Id. at 494.  Thus, the Court held that "death resulting from

driving while intoxicated does not constitute an accident because

it is reasonably foreseeable that death or serious bodily harm will

result therefrom."  Id. at 495; see also id. at 493 (emphasizing

that "if a reasonable person would have expected the injury to occur as a result of the insured's actions, then the resultant injury is not an accident").

In Stamp I, the Court noted its recent application of the Wickman test in Mullaney. 466 F.Supp.2d at 431. The Court rejected cases cited by the plaintiff finding death as a result of driving while intoxicated to be accidental, id., noting that many of those cases relied on statistical evidence, see id., which the Court characterized as "meaningless:"

> The statistics cited by the courts above are meaningless in this context. They do not consider the characteristics of the driver, the type of road involved, the length of the fatal drive, how long the driver had been intoxicated, and most importantly, the degree of his intoxication. These factors appear to the Court to be crucial to a determination of whether the driver was so intoxicated as to make a fatal collision highly likely.

466 F.Supp.2d at 432.

The Stamp I Court, following Wickman, concluded that:

> [W]hile death as a result of driving while intoxicated is not, as a matter of law, non-accidental, in this case, Mr. Stamp's blood alcohol level was so elevated that the intentional conduct of operating his car while so intoxicated was highly likely to result in the injury he did suffer. While it may be true that an intoxicated driver is more likely to arrive safely at home than to be arrested or injured, when compared with a sober driver, the highly intoxicated driver is many times more likely to be fatally injured. A driver who is over three times the legal limit of blood alcohol level, as Mr. Stamp was, is so impaired that, in this Court's view, he is likely to "pass out" or "black out" and cause a fatal collision to occur. ... Thus, while Mr. Stamp may have had every expectation of arriving at his parents' home safely, a reasonable person of similar background and characteristics would have viewed Mr. Stamp's conduct as

highly likely to result in a fatal injury. For this
reason, Defendants' determination that Mr. Stamp's death
was not accidental is reasonable and supported by
substantial evidence in the record.

466 F.Supp.2d at 433; see also Mullaney, ("[I]f a reasonable person

would have expected the injury to occur as a result of the

insured's actions, then the resultant injury is not an accident.").

The "most important[]," Stamp I, 466 F.Supp.2d at 432, factor to

consider in determining whether the driver was so intoxicated as to

make a fatal collision highly likely is "the degree of his

intoxication," id.

    The First Circuit affirmed the plan administrator's

determination, and this Court's judgment, that "the insured was so

highly intoxicated that his death was not an 'accident.'" Stamp

II, 531 F.3d at 85. The court observed that:

    In applying the Wickman analysis to drunk-driving
    deaths, courts have stated that "'the hazards of drinking
    and driving are widely known and widely publicized'" and
    reasoned that, as a result, "the insured should have
    known that driving while intoxicated was highly likely to
    result in death or bodily harm." As the Supreme Court
    recently observed, albeit in a different context,
    "[d]runk driving is an extremely dangerous crime." It is
    common knowledge that the danger grows even more extreme
    as the driver's level of intoxication increases.

Stamp II, 531 F.3d at 90 (alteration in original)(internal

citations omitted). The Stamp II court further noted that "courts

have emphasized the decedent's level of intoxication when

determining that a plan administrator's denial of benefits was

reasonable," id., and that the court "endorse[d] this approach,"

id. at 91. The First Circuit reiterated that "[t]he Wickman analysis does not require a categorical determination that all alcohol-related deaths are per se accidental or nonaccidental. Rather, it leads us to consider the circumstances of the fatal event in question." Id.; see also id. at 91 n.9 ("[T]he proper approach is fact-specific and ... the decedent's degree of intoxication is particularly probative.").

With these precedents in mind, the Court turns to the circumstances surrounding Mr. Hauser's death. Presumably, when he purchased the AD&D policy Mr. Hauser did not expect the type of injury which occurred. See Wickman, 908 F.2d at 1088 ("Generally insureds purchase accident insurance for the very purpose of obtaining protection from their own miscalculations and misjudgments."). Nonetheless, as noted, this is only a "starting point." Stamp II, 531 F.3d at 88 (citing Wickman, 908 F.2d at 1088). "The operative inquiry into the insured's 'expectations' in Wickman actually concerned the insured's state of mind at the time of the incident that caused his death, not at the time the policy was purchased." Id. (citing Wickman, 908 F.2d at 1089). However, this subjective inquiry is not determinative. Id. at 89. Where, as here, there is little or no information regarding the insured's subjective state of mind, see id. ("the subjective state of mind of the insured cannot be generally known")(quoting Wickman, 908 F.2d at 1087-88), the court should then undertake an objective analysis

of the insured's expectations.  Id. ("Thus, in the usual case, where the fact-finder will find 'the evidence insufficient to accurately determine the insured's subjective expectation,' the fact-finder 'should then engage in an objective analysis of the insured's expectations.'")(quoting Wickman, 908 F.2d at 1088).  The Wickman court "framed this objective analysis as an inquiry into 'whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct.'" Id. (quoting Wickman, 908 F.2d at 1088).

This Court cannot find that a reasonable person in Mr. Hauser's position would have viewed the event which caused his death as unlikely to have occurred given his intentional conduct of driving with a blood alcohol level of .32%, four times the legal limit.  See Stamp II, 531 F.3d at 90 (noting that "the hazards of drinking and driving are widely known and widely publicized," that "the insured should have known that driving while intoxicated was highly likely to result in death or bodily harm," and that "the danger grows even more extreme as the driver's level of intoxication increases"); see also id. ("Following this logic, courts have emphasized the decedent's level of intoxication when determining that a plan administrator's denial of benefits was reasonable.").  Thus,

> any drunk driver who takes to the road should know he
> runs a risk of injuring another person [or himself].  The

26

extent of the risk will of course vary from case to case,
depending on how intoxicated the driver is, how far he
drives, how fast he drives, and how many other drivers
and pedestrians are sharing the road with him.

Id. (quoting Lennon v. Metro. Life Ins. Co., 504 F.3d 617, 621 (6th

Cir. 2007))(alteration in original).

In the instant matter, Defendant has provided an affidavit

from its medical consultant, Robert Stoltz, M.D., who attests that:

A person at [Mr. Hauser's] extreme level of intoxication
is at risk of coma or death and will likely experience
confusion, dizziness, exaggerated emotions (anger, fear,
grief)[,] impaired visual perception, decreased pain
sensation, significantly impaired balance, slurred
speech, moderate muscle incoordination, apathy, impaired
consciousness, stupor, significantly decreased response
to stimulation, severe muscle incoordination, inability
to stand or walk, vomiting and incontinence of urine and
feces.

Affidavit of Robert Stoltz, M.D. ("Stoltz Aff.") ¶ 5. Other courts

have made similar observations. See Stamp II, 531 F.3d at 91

("MetLife's medical department had advised that this level of

intoxication [.231%-.265%] 'would cause delirium intoxication. In

a sporadic drinker it would cause lethargy, stupor, combativeness,

incoherency & vomiting."); Smith, 473 F.Supp.2d at 907 ("At this

blood alcohol level, Smith would have been intoxicated and would

have experienced some or all of the following symptoms: emotional

instability; loss of critical judgment; impaired perception, memory

and comprehension; impaired sensatory response; impaired reaction

time; impaired visual acuity, peripheral vision, depth of field and

glare recovery; sensory-motor incoordination; impaired balance and

drowsiness.  A .164g/100ml level of alcohol would impair a person's ability to make proper adjustments for traffic, road and weather conditions, recognize the effects of various driving conditions and recognize his own physical and mental limitations."); Stamp I, 466 F.Supp.2d at 433 ("A driver who is over three times the legal limit of blood alcohol level,[16] as Mr. Stamp was, is so impaired that, in this Court's view, he is likely to 'pass out' or 'black out' and cause a fatal collision to occur."); Murphy v. J.C. Penney Life Ins. Co., No. Civ.A. 02-1948, 2003 WL 22670838, at *2 (W.D. La. Oct. 21, 2003)(accepting report of the defendant's expert concluding that the decedent's alcohol level of .26% indicated severe impairment, which would cause effects including "a marked diminution in visual acuity, the slowing of reflex action and associated motor activities, a diminution in critical judgement and the ability to concentrate, a diminution in the ability to divide his attention between objects, a diminished ability to maintain his attention span, and a diminished ability to discern a dangerous situation"); Mullaney, 103 F.Supp.2d at 488 (quoting the defendant's medical consultant's memorandum which noted that "in a person with a blood alcohol level approximating that of Mr. Mullaney [.37%], the symptoms that would have been present were 'approaching loss of motor functions, markedly decreased response

---

[16] The Stamp I Court noted that "the blood alcohol level found by the Medical Examiner is unequivocal evidence of Mr. Stamp's intoxication at the time of death ...."  466 F.Supp.2d at 426.

to stimuli, marked muscular incoordination, inability to walk or stand, vomiting, incontinence, impaired consciousness, sleep or stupor'").

Dr. Stoltz concluded by stating that "Mr. Hauser was, in my opinion, incapable of operating a motor vehicle safely at a 0.32% blood alcohol content. Intoxication at that extreme level significantly increased the risk of his suffering serious bodily injury or death." Stoltz Aff. ¶ 6. Plaintiff has proffered no counter-affidavits or other evidence to dispute Dr. Stoltz's opinion. See Murphy, 2003 WL 22670838, at *2 (noting that the plaintiff had produced no expert testimony to dispute the defendant's medical expert's findings or otherwise discredit his opinion and, accordingly, accepting the doctor's expert testimony as fact). While it is true, as Plaintiff states, see Plaintiffs' S.J. Mem. at 6, that "[t]he driving conditions ... were not ideal,"[17] id., Mr. Hauser's "extreme level of intoxication," Stoltz Aff. ¶ 5, severely impaired his ability to react to less than ideal

_____

[17] It is unclear what the actual weather conditions were at the time of the incident. Defendant's SUF notes the state troopers' reports which indicated that the road conditions were "icy," Defendant's SUF ¶ 13 (quoting Allen Aff., Ex. 2 (Lagor Incident Report)), and that "the weather conditions were freezing rain/snow and the roadways were coated with ice and a small amount of snow," id. ¶ 14 (quoting id., Ex. C (Revello Incident Report)). However, Mr. Demuth stated that the weather and road conditions were "[s]light precipitation ...." Id., Ex. C (Witness Statement). Mr. Demuth subsequently described the weather conditions at the time as "light rain," id., Ex. A (Demuth Dep.) at 5, and testified that the "[r]oad was wet from the light rain," id. He further stated that "it was raining at the time this happened, and probably within the next 20 minutes it turned over to snow and ice." Id. at 11.

conditions, see Smith, 473 F.Supp.2d at 907 (listing among symptoms likely to be experienced by person with blood alcohol level of .164% impaired ability to make adjustments for traffic, road, and weather conditions and recognize effects of various driving conditions); Murphy, 2003 WL 2003 WL 22670838, at *2 (including among effects of .26% alcohol level diminished ability to discern a dangerous situation). Mr. Hauser's level of intoxication more than offsets any effect the weather conditions may have had. See Stamp II, 531 F.3d at 92 (reiterating that "the risk of being involved in a fatal crash rises as blood alcohol levels rise").

Based on the foregoing, the Court concludes that Mr. Hauser's death cannot be considered accidental and that, therefore, Plaintiffs have not met their burden of establishing that his death was a covered loss under the Policy. See Mullaney, 103 F.Supp.2d at 494 ("Mr. Mullaney's actions clearly fail the Wickman test, and his death cannot be considered 'accidental.'"). A reasonable person in Mr. Hauser's position "should have known that driving while intoxicated was highly likely to result in death or bodily harm," Stamp II, 531 F.3d at 90 ; see also Walker v. Metro. Life Ins. Co., 24 F.Supp.2d 775, 781 (E.D. Mich. 1997)("A reasonable person with the decedent's background and experience would have known that injury was highly likely to occur as a result of decedent's intentional conduct in driving while intoxicated."). Thus, Defendant's Motion for Summary Judgment should be granted.

See Stamp I, 466 F.Supp.2d at 433 ("[A] reasonable person of similar background and characteristics would have viewed Mr. Stamp's conduct as highly likely to result in a fatal injury."); see also Stamp II, 531 F.3d at 93 ("Mr. Stamp's decision to drive while grossly intoxicated qualifies as overwhelmingly and disproportionately risky conduct."); Walker, 24 F.Supp.2d at 781 ("decedent knew or should have known that serious bodily injury or death was a probable consequence substantially likely to occur as a result of driving while intoxicated"); Mullaney, 103 F.Supp.2d at 494 (noting that decedent's death while driving after consuming enough alcohol to give him a blood alcohol level of nearly four times the legal limit could not be considered accidental").

## 2. Does either the alcohol exclusion or the felony exclusion apply?

Plaintiffs assert that "[t]he only true challenge to coverage would come from an applicable exclusion," Plaintiffs' S.J. Mem. at 7, and that neither exclusion applies, id. Defendant argues that "[e]ven if the Court should deem Mr. Hauser's death an 'accident' the Policy's alcohol exclusion bars recovery," Defendant's S.J. Mem. at 11, or, alternatively, the felony exclusion bars Plaintiffs' claims, id. at 15. However, given its finding that Mr. Hauser's death was not an accident, the Court need not examine whether the policy exclusions apply. See Mullaney, 103 F.Supp.2d at 495 ("[T]here is no need to resort to an examination of policy

exclusions where the requirement of an 'accident' is a clearly and unambiguously expressed condition of coverage in the granting clause. Since this Court has held that decedent's death was not accidental there is no need for an analysis of the policy exclusions."); see also Stamp I, 466 F.Supp.2d at 433 (declining to address exclusions based on finding that non-accidental nature of insured's death from driving while severely intoxicated was reasonable).

### 3. Did Defendant act in bad faith in denying Plaintiffs' claim?

Finally, Plaintiffs argue that: "[a] determination of the question of bad faith cannot be made until the issue of whether the insurer breached its obligation under the insurance contract has first been considered," Plaintiffs' Obj. Mem. at 1 (citing Rumford Prop. & Liab. Ins. Co. v. Carbone, 590 A.2d 398, 400 (R.I. 1991); Bartlett v. John Hancock Mut. Life Ins. Co., 538 A.2d 997, 1000 (R.I. 1988)); "the question of whether or not an insurer has acted in bad faith in refusing to settle a claim shall be a question to be determined by the trier of fact," id. (citing R.I. Gen. Laws § 9-1-33[18]); and "Plaintiffs have not issued any discovery to

---

[18] Section 9-1-33 provides in relevant part that:

(a) Notwithstanding any law to the contrary, an insured under any insurance policy as set out in the general laws or otherwise may bring an action against the insurer issuing the policy when it is alleged that the insurer wrongfully and in bad faith refused to pay or settle a claim made pursuant to the provisions of the policy, or otherwise wrongfully and in

Defendant regarding bad faith ...," id. at 2.  Defendant contends that Plaintiffs' bad faith claim fails as a matter of law because they cannot point to any specific facts that would constitute evidence of bad faith.  Defendants' Obj. Mem. at 2.

In Skaling v. Aetna Insurance Co., 799 A.2d 997 (R.I. 2002), the Rhode Island Supreme Court stated that "bad faith is established when the proof demonstrates that the insurer denied coverage or refused payment without a reasonable basis in fact or law for the denial."  Id. at 1010.  However, "an insurer is entitled to debate a claim that is fairly debatable ...."  Id. at 1011.  The Skaling court further noted that "not every refusal to pay amounts to insurer bad faith.  A plaintiff must demonstrate an absence of a reasonable basis in law or fact for denying the claim or an intentional or reckless failure to properly investigate the claim and subject the result to cognitive evaluation."  Id. at 1012.

Here, Stonebridge's denial clearly meets the "fairly debatable" standard.  As Defendant correctly notes, "whether Mr. Hauser's death constitutes an 'accident' and whether exceptions in

---

bad faith refused to timely perform its obligations under the contract of insurance.  In any action brought pursuant to this section, an insured may also make claim for compensatory damages, punitive damages and reasonable attorney fees.  ...

....

R.I. Gen. Laws § 9-1-33(a) (1997 Reenactment); see also Skaling v. Aetna Ins. Co., 799 A.2d 997, 1010 (R.I. 2002).

the [P]olicy apply are contested issues." Defendant's Obj. Mem. at 2; cf. Imperial Cas. & Indem. Co. v. Bellini, 947 A.2d 886, 893 (R.I. 2008)("Giving considerable weight to the fact that there was a fully understandable and not at all frivolous debate as to whether or not the property was covered by the pertinent insurance policy, we simply cannot say that it was demonstrated that there was an absence of a reasonable basis in law or fact for denying the claim ....")(internal citation and quotation marks omitted). Nor have Plaintiffs provided any evidence of "an intentional or reckless failure to properly investigate the claim and subject the result to cognitive evaluation."[19] Skaling, 799 A.2d at 1012.

With regard to Plaintiffs' arguments, the Court has already considered the underlying breach of contract claim. Thus, Plaintiffs' contention that the Court cannot address the bad faith claim fails. Moreover, since neither party has requested a jury trial, see Dkt., the Court is the trier of fact. Finally, given the Court's finding that Defendant's denial of Plaintiffs' claim

---

[19] Presumably Plaintiffs argue that the fact that they have issued no discovery to Defendant with regard to bad faith prevents them from making such showing. However, they have not disputed Defendant's SUF, the Allen Aff., or the exhibits attached to those documents. Nor have they included any exhibits of their own in their filings. They simply state in their Complaint that "Defendant's denial of Plaintiffs' claim for accidental death benefits was done in bad faith," Complaint ¶ 25, and that they are entitled to damages as a result, see id. ¶ 26.

Moreover, at the August 24, 2011, hearing, while Plaintiffs argued that there were genuine issues of fact to be addressed with regard to the bad faith count of their Complaint, they admitted that such issues did not appear in the papers before the Court. Rather, they asked the Court to rely on the record, but they pointed to nothing in the record which would indicate that Defendant acted in bad faith in denying their claim.

was at least "fairly debatable," discovery regarding bad faith is unnecessary.

**IV.  Summary**

The Court finds that, even construing the term "accident" in Plaintiffs' favor, Mr. Hauser's death cannot be considered accidental.  Mr. Hauser chose to drive with a blood alcohol level of .32%.  That decision was not objectively reasonable.  Although they have certainly experienced a tragic loss, Plaintiffs have not met their burden of showing that the loss was covered by the Policy.  Accordingly, Defendant's Motion for Summary Judgment should be granted and Plaintiffs' Motion for Summary Judgment should be denied.  I so recommend.

**V.  Conclusion**

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be granted and that Plaintiffs' Motion for Summary Judgment be denied.  Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt.  See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision.  See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ *David L. Martin*
DAVID L. MARTIN
United States Magistrate Judge
March 5, 2012